**Robert C. KANUTH, Jr., Appellee,**

v.

**PRESCOTT, BALL & TURBEN, INC., Appellant.**

No. 90–7182.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1991.

Decided Dec. 13, 1991.

Joan M. Hall, with whom J. Kevin McCall, Sidney I. Schenkier and Jeffrey T.

Shaw, Chicago, Ill., were on the brief, for appellant.

Thomas A. Gottschalk, with whom John G. Froemming, Washington, D.C., was on the brief, for appellee.

Before BRENNAN, Associate Justice (Retired),* WALD and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Prescott, Ball & Turben, Inc. ("PBT") appeals from a decision of the district court granting the motion of appellee Robert C. Kanuth, Jr. ("Kanuth") to confirm an arbitral award of $38,233,079 and denying PBT's motion to vacate or modify that award. Appellant has made two arguments on appeal: First, that the district court erred in confirming the award because the arbitral panel ("panel") ignored an unambiguous provision of the employment agreement which had the result of improperly increasing the total damage award by over $12 million; and, second, that the district court erred in confirming the award, because the panel manifestly disregarded applicable law in failing to take into account the actual performance of Kanuth's company when accepting the expert's projection of future revenues.

Because we believe that the district court was correct in holding that the panel did not ignore the plain and unambiguous meaning of the governing contract and that it did not manifestly disregard applicable law when reaching its decision on the proper award, we affirm.

* The Honorable William J. Brennan, Jr., Associate Justice of the United States Supreme Court, retired, sitting by designation pursuant to 28 U.S.C. § 294(a).

1. According to paragraph 7 of the Employment Agreement,

    (a) During the Initial Period, Net Pretax Earnings of the Business shall be utilized to create an annual Incentive Compensation Pool in accordance with the following rules:

    (i) The first $2,000,000 (the "Exclusion Amount") of such Net Pretax Earnings shall, each year, be retained by PBT.

## I. BACKGROUND

Kanuth was the founder, chief executive officer, and principal shareholder of Cranston Corporation ("Cranston"). Cranston owned all outstanding shares of Cranston Securities, Inc., a firm engaged principally in the business of underwriting tax-exempt municipal bonds. Cranston Securities, Inc. was extremely successful, earning almost $8 million in 1986 alone. In September 1987, Kanuth agreed to sell Cranston to PBT, a division of Kemper Securities Group, Inc., and the parties entered into a Stock Purchase Agreement and an Employment Agreement. PBT purchased Cranston's shares in Cranston Securities, Inc. for approximately $11.3 million, and it retained Kanuth as head of Cranston/Prescott, the newly-organized finance division of PBT.

The Employment Agreement was executed on September 4, 1987. Kanuth describes the contract as an "earnout" agreement according to which Kanuth would be paid during an initial five-year period from future earnings of Cranston/Prescott in order to compensate Kanuth for the remainder of the purchase price of Cranston Securities, Inc. Although PBT does not describe the agreement in these terms, there is no dispute that the Employment Agreement provided that Kanuth would receive not only a salary and bonus, but that he would also retain complete control over the distribution of an "incentive compensation pool." [1] This pool was to be funded from any net pretax earnings generated by Cranston/Prescott. During the initial five-year period, the first $2 million of net pre-

    (ii) If Net Pretax Earnings for any year exceed the Exclusion Amount, 80% of such excess shall be allocated to that year's Incentive Compensation Pool. If Net Pretax Earnings for any year fail to exceed the Exclusion Amount (the "Shortfall"), the succeeding year's Net Pretax Earnings (or those for successive subsequent years, if necessary) shall first be reduced by the Shortfall, and only thereafter shall 80% of the remainder be allocated to the Incentive Compensation Pool for that succeeding (or successive subsequent) year.

Employment Agreement ¶ 7.

tax earnings in each year would go to PBT, and eighty percent of any remaining revenues would flow into Kanuth's incentive compensation pool.[2]

The "net pretax earnings" for any given year were to be determined in accordance with the requirements found in Exhibit A to the Employment Agreement.[3] After first listing what should be included in net pretax earnings, Exhibit A then provided that certain expenses should be deducted. Of particular relevance for this appeal is the following: With respect to the Initial Period only, deductible expenses were to include "all bonuses or other incentive compensation paid to or for the benefit of Business employees." Employment Agreement, Exhibit A, ¶ 2(d) ("¶ 2(d)"). The district court concluded that "[p]aragraph 2(d) of the employment contract clearly requires that bonus and incentive compensation payments be included in Deductible Expenses." *Kanuth v. Prescott, Ball & Turben, Inc.*, No. 88-01416, Memorandum Opinion at 11, 1990 WL 179601 (D.D.C. Nov. 2, 1990) ("Mem.Op.").

Several months after the acquisition of Cranston by PBT, disputes arose between the parties. According to Kanuth, PBT's parent company had fired PBT's chairman and installed new managers for PBT that were unhappy with the agreement between Kanuth and the previous PBT management. According to PBT, Cranston/Prescott had been unprofitable, and PBT was concerned about Kanuth's managerial autonomy. Kanuth filed suit in federal district court on May 24, 1988, alleging breach of the Employment Agreement, breach of the implied covenant of good faith and fair dealing, and fraud.

On June 13, 1988, PBT filed an arbitration claim with the National Association of Securities Dealers, Inc., alleging that Kanuth had engaged in various forms of misconduct, both before and after the acquisition. PBT fired Kanuth one week later, on June 21, 1988. Finally, PBT moved to compel arbitration pursuant to a standard arbitration clause, and the district court granted the motion on August 8, 1988. *See Kanuth v. Prescott, Ball & Turben, Inc.*, No. 88-01416, Order, 1988 WL 90392 (D.D.C. Aug. 8, 1988).

Between May 23, 1989 and April 20, 1990, a panel of three arbitrators heard testimony from 40 witnesses, taken over 22 days. The transcript of the proceedings comprises nearly 7,000 pages, and the panel examined approximately 1,200 exhibits. The panel heard closing arguments and considered post-trial briefs submitted by both parties. On May 2, 1990, the panel issued its decision awarding Kanuth $38,233,079 in damages.[4] The award consisted of the following:

| | |
|---|---|
| Salary for initial five years: | $ 1,775,870.00 |
| Incentive compensation: | $31,457,209.00 |
| Defamation: | $ 1,000,000.00 |
| Emotional distress: | $ 3,000,000.00 |
| Punitive damages: | + $ 1,000,000.00 |
| TOTAL: | = $38,233,079.00 |

Award (May 2, 1990) ("Award") at 6–8; *see also* Mem. Op. at 2.

Kanuth filed a motion to confirm the arbitration award and to enter judgment on May 25, 1990. PBT opposed this motion and filed a motion to vacate or modify the arbitral award on July 9, 1990. PBT argued that the panel exceeded its authority and disregarded applicable law in reaching its decision. After oral argument on these motions, the district court confirmed the arbitral award of $38,233,079 and entered judgment for that amount. PBT has appealed the judgment of the district court on the following two grounds: First, the district court erred in not modifying the amount of the award attributable to lost incentive compensation, because the panel ignored the plain meaning of ¶ 2(d) in failing to deduct from the projected net pretax

---

2. The Employment Agreement provided further that after the initial five-year period, PBT would no longer receive the first $2 million off the top and the total net pretax earnings would be split 50–50 between Kanuth and PBT. *See* Employment Agreement ¶ 8(a).

3. *See* Employment Agreement ¶ 7(a)(iv).

4. The panel's actual award—$38,232,979—contained an arithmetic error of $100. The error was corrected by the district court. *See* Mem. Op. at 2 n. 4.

earnings the amount of incentive compensation that would have been payable for the previous year; and, second, the district court erred in not vacating the entire incentive compensation award because the panel did not consider the actual performance history of Cranston/Prescott when estimating future revenues as required for lost profit projections under the governing law of the contract, which in this case is the law of Ohio.[5]

## II. DISCUSSION

The United States Arbitration Act provides for the vacation of arbitral awards only under limited circumstances:

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10 (1988).

Courts have recognized that judicial review of arbitral awards is extremely limited. "Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union v. Misco, Inc.*, 484

U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). As the Supreme Court made clear almost forty years ago, "[t]he United States Arbitration Act establishes by statute the desirability of arbitration as an alternative to the complications of litigation." *Wilko v. Swan*, 346 U.S. 427, 431, 74 S.Ct. 182, 185, 98 L.Ed. 168 (1953). In, the famous *Steelworkers' Trilogy*, the Court emphasized that "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960); *see id.* at 597, 80 S.Ct. at 1361 (in interpreting and applying a contract, an arbitrator "may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the [contract]").[6]

Courts have suggested that, in addition to the statutory grounds for vacating an arbitral award, an award may be vacated if the arbitrators made the award in "manifest disregard of the law." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 9 & n. 5 (1st Cir. 1990); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986). This formulation comes from dicta in *Wilko v. Swan*, 346 U.S. at 436–37, 74 S.Ct. at 187–88, 98 L.Ed. 168, and it is clear that it means more than error or misunderstanding with respect to the law. *Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 532 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1474, 108 L.Ed.2d 612 (1990); *Bobker*, 808 F.2d at 933 ("The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator."); *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 893 (2d Cir.1985) (manifest dis-

---

5. The Employment Agreement expressly provided that "[t]he validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Ohio." Employment Agreement ¶ 12.

6. *See also United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

regard of the law may be found if arbitrator understood and correctly stated the law but proceeded to ignore it).

## A. *Plain Language of the Employment Agreement*

■ In order to prove damages at the arbitration hearing, Kanuth retained William O'Connell ("O'Connell"), a partner with the accounting firm of Deloitte & Touche, to give expert testimony on quantifying lost earnings after a business interruption. O'Connell testified to having personally spent over 600 hours reviewing relevant financial and operational information, including deal files and financial statements, from the predecessor companies (PBT and Cranston Securities, Inc.) as well as from the successor company (Cranston/Prescott). Based on this extensive review of the available records, O'Connell concluded that net pretax earnings would have amounted to $49,321,511 for the initial five-year period. Pursuant to the Employment Agreement, PBT would have been entitled each year to the first $2 million of net pretax earnings, and Kanuth would have received eighty percent of the remainder in incentive compensation. According to O'Connell's calculations, Kanuth would have been entitled to a total of $31,457,209 in incentive compensation during the initial period. *See* Kanuth Exhibit 600, Exhibit A—Damages.

■ In typical fashion, the panel did not explain how it derived the particular numbers associated with each element of the total damage award. Of course, the panel is not required to give an explanation, *see Sargent*, 882 F.2d at 532 ("an explanation requirement would unjustifiably undermine the speed and thrift sought to be obtained by" arbitration), and courts will not generally inquire into the basis of a lump-sum award "unless they believe that the arbitrators rendered it in 'manifest disregard' of the law or unless the facts of the case fail to support it." *Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir.1985). In this case, however, the "lump sum" is not particularly mysterious—the panel determined that Kanuth was entitled to lost incentive compensation totalling $31,457,209, the exact figure proposed by Kanuth's expert witness as the amount of incentive compensation to which Kanuth would be entitled after the five-year initial period. The panel ordered that a portion of this sum be paid immediately, with the remainder to be paid in quarterly installments over a ten-year period.[7]

Kanuth suggests that "[i]n using the same amount of damages over an extended time frame, it cannot be assumed that the Panel necessarily adopted O'Connell's methodology. Perhaps, it did; perhaps, it did not." Brief for Plaintiff–Appellee Robert C. Kanuth, Jr. (filed Oct. 11, 1991) at 31. PBT calls this assertion "frivolous," and it insists that the "only conceivable basis for the panel's award is the reasoning underlying O'Connell's incentive compensation projection, which the panel necessarily adopted in awarding the exact figure which O'Connell advanced." Reply Brief for Defendant–Appellant Prescott, Ball & Turben, Inc. (filed Oct. 22, 1991) at 6.

There appears to be no dispute that when arriving at the figure of $31,457,209, O'Connell did not deduct from projected net pretax earnings the amount that would have been paid to Kanuth as incentive compensation for the previous year. It is also undisputed that O'Connell was never cross-examined on this point during the arbitration hearing and that PBT never made any argument to the panel in its post-hearing brief that such a deduction was required under the Employment Agreement.[8] PBT

---

7. Specifically, of the total $31,457,209 awarded for incentive compensation, the panel ordered that 20%, or $6,291,442, be paid immediately. The balance, $25,165,767, would be paid in forty quarterly installments of $629,144.17 each, and the balance would not bear interest. *See* Award at 8.

8. PBT has suggested that its counsel referred to O'Connell's failure to make the proper deductions during closing argument before the panel. But PBT's counsel said only that the Employment Agreement contemplated the deduction of expenses from revenue; counsel did not even mention ¶ 2(d) or single out its proper construction as a critical issue. *See* Transcript of Hearing before Arbitration Panel (Apr. 20, 1990)

retained new counsel when it moved to vacate the award in district court, and it seems likely that the argument it now makes as to the relationship between the previous year's incentive payments under ¶ 2(d) and the subsequent year's earnings first occurred to PBT after the arbitration was completed. Assuming, however, for argument's sake, that PBT is free to raise this issue for the first time in court and assuming, also, that the plain meaning of ¶ 2(d) is, as PBT asserts, that incentive compensation paid for one year should have been deducted from net pretax earnings for the subsequent year,[9] it is still clear to us that the panel's award must be confirmed.

PBT's counsel admitted at oral argument that § 10(d) of the United States Arbitration Act provides the only statutory authority for vacating this award. According to that subsection, an award may be vacated "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(d) (1988). This court has determined that "[i]t is particularly necessary to accord the 'narrowest of readings' to the excess-of-authority provision of section 10(d). That provision does not, it must be stressed, confer on courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral one." *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d

160, 165 (D.C.Cir.1981) (citation omitted) (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 703 (2d Cir.1978)). PBT suggests nonetheless that in accepting O'Connell's damage estimates, the panel failed to apply the plain meaning of ¶ 2(d) and, therefore, exceeded its authority.

The Supreme Court recently considered the issue of when an arbitrator's misreading of the plain language of a contract would justify vacating the arbitral award:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.... [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987).

The cases on which PBT relies for the proposition that arbitrators exceed their powers when they ignore the plain language of a contract have, in the main, involved situations in which the arbitrators did not have the authority under the contract itself to construct the kind of remedy that they have proposed.[10]

---

("Transcript") at 6879, attached as Exhibit 54 to Reply Memorandum of Points and Authorities in Support of Defendant's Motion to Vacate or Modify and in Opposition to Plaintiff's Motion [to] Confirm the Arbitral Award (D.D.C. filed July 24, 1990).

9. That this argument apparently never occurred to PBT during the arbitration suggests that the meaning of ¶ 2(d) may not be so plain and unambiguous as PBT would have us believe.

10. *See, e.g., AP Parts Co. v. UAW*, 923 F.2d 488, 490–91 (6th Cir.1991) (arbitrator concluded that he had insufficient information to formulate opinion and remanded matter to parties for further negotiation; this exceeded his authority under arbitration clause which allowed him to interpret or apply agreement but not to add to, detract from, ignore, or change terms of agreement); *Leed Architectural Prods., Inc. v. United Steelworkers*, 916 F.2d 63, 65–66 (2d Cir.1990)

(arbitrator determined that company's decision to pay higher wage to one worker violated collective bargaining agreement; however, he exceeded his authority when he required that company pay higher wage to all workers, for contract explicitly required that wage rate be determined through collective bargaining); *Bruno's, Inc. v. United Food & Commercial Workers Int'l Union*, 858 F.2d 1529, 1532 (11th Cir.1988) (agreement specified that employer alone had right to establish and maintain reasonable regulations concerning employee operations; arbitrator exceeded his authority when, after striking down old rule as unfair, he crafted new rule in its place); *S.D. Warren Co. v. United Paperworkers' Int'l Union*, 845 F.2d 3, 6–7 (1st Cir.) (contract contemplated that arbitrator would determine whether or not company rule was violated; arbitrator exceeded his authority when, once he found a violation, he purported to fashion remedy), *cert. denied*, 488 U.S. 992,

That is not the case here. Over Kanuth's strong objection, PBT insisted on having an arbitral panel determine the damages occasioned by the breach of the Employment Agreement. PBT agreed "to abide by and perform" any award rendered by the panel, *see* Uniform Submission Agreement—NASD Arbitration, ¶ 4. In contrast to the cases relied on by PBT, there is no question here of the panel having exceeded its authority by crafting a remedy that was not contemplated by the governing contract. The parties explicitly requested the panel to award monetary damages to the injured party, and that is precisely what it did.

The damages in this case were based on accountant projections of future earnings for a company that had existed for less than ten months. By their very nature, these damages were speculative. The panel was not engaged in an exact science; it examined 1,200 exhibits and 7,000 pages of testimony and then came up with a lump-sum figure of $31,457,209 for lost incentive compensation. This number clearly came from O'Connell's estimates; but the panel was well within its authority to borrow from Kanuth's expert what it believed to be a reasonable estimate of the incentive compensation Kanuth would have received had PBT not breached the contract. Even assuming that O'Connell failed to deduct certain expenses from the estimates as required by the contract, this fact does not detract from the panel's implicit determination that an award of $31,457,209 for lost incentive compensation was just and reasonable.

PBT cites *Inter–City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184 (8th Cir.1988),

for the proposition that an award may be vacated whenever the arbitrator ignores the "plain language" of a contract. But *Boise Cascade* does not stand for such a broad proposition. The arbitrator in *Boise Cascade* concluded that Inter–City had overcharged Boise Cascade for natural gas because it had based its retail rate on a higher wholesale rate instead of the lower rate that was later adopted by the regulatory agency. The court vacated the arbitral award because the arbitrator had ignored a provision in the gas contract that specifically required the rates which Inter–City could charge Boise Cascade to track the wholesale rates set by the valid regulatory authority. *Id.* at 187. For the time period in question, the lower wholesale rates had not yet been adopted; the only wholesale rates that had been set by the valid regulatory authority during the time period at issue were the higher rates, and it was these rates which Inter–City had used to calculate the rates charged Boise Cascade. Anyone applying the plain language of the contract to these facts would have concluded that Inter–City had in fact charged Boise Cascade at the proper rate. *Id.* at 188.

*Boise Cascade* is easily distinguished. It was clear simply by looking at the arbitrator's award that he had completely ignored the contract. The court in *Boise Cascade* simply could not conclude that "the arbitrator [was] even arguably construing or applying the contract," *Misco*, 484 U.S. at 38, 108 S.Ct. at 3, and that is why the award had to be vacated.

In our case, the panel first had to determine which party was liable for the breach of the employment contract and then, based on inherently imprecise projections

109 S.Ct. 555, 102 L.Ed.2d 582 (1988); *Industrial Mut. Ass'n v. Amalgamated Workers,* 725 F.2d 406, 411 (6th Cir.1984) (as part of remedy for improper discharge, arbitrator awarded to all storekeepers cancellation of their outstanding debts; arbitrator exceeded his authority because agreement unequivocally placed financial responsibility for those debts on storekeepers, and arbitrator only had authority to award money damages); *Coast Trading Co. v. Pacific Molasses Co.,* 681 F.2d 1195, 1198 (9th Cir.1982) (arbitration panel exceeded its authority when it crafted remedy not contemplated by trade association rules which had been incorporated into pur-

chase agreement); *Davis v. Chevy Chase Fin. Ltd.,* 667 F.2d 160, 165–66 (D.C.Cir.1981) (under arbitration agreement, arbitrator only had authority to determine fair market value of tendered shares; in also ruling that party was obligated to sell the shares, arbitrator exceeded his authority); *J.P. Greathouse Steel Erectors, Inc. v. Blount Bros. Constr. Co.,* 374 F.2d 324, 325 (D.C.Cir.) (arbitration clause explicitly limited arbitrators' authority to resolving questions of fact; because they implicitly decided questions of law, they exceeded their authority), *cert. denied,* 389 U.S. 847, 88 S.Ct. 64, 19 L.Ed.2d 116 (1967).

of future earnings and future expenses, it had to estimate the amount of damages to which the injured party was entitled. Even if O'Connell's estimates were based on a misreading of the Employment Agreement, the panel adopted the expert's projections because it believed them to be a reasonable estimate of damages. In contrast to the arbitrator's award in *Boise Cascade*, there is nothing on the face of the panel's lump-sum award which suggests that the panel failed to construe the contract. To hold otherwise would require us to inquire into precisely how and why the panel derived the lump-sum award, an inquiry clearly outside of our limited scope of review.

### B. *Application of Governing Law*

█ PBT's second argument is that the entire incentive compensation award should be vacated because, when estimating what the future revenues of Cranston/Prescott would have been in the absence of a breach, O'Connell did not take into consideration the ten months of actual revenue experience as the basis for his lost profit projections. Brief for Defendant–Appellant Prescott, Ball & Turben, Inc. (filed Sept. 11, 1991) at 29–32. PBT claims that the panel's adoption of O'Connell's projections reflected a "manifest disregard" of Ohio law.

As explained above, "manifest disregard" means much more than failure to apply the correct law. "Manifest disregard" may be found, for example, if the panel understood and correctly stated the law but then proceeded to ignore it. *See Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 893 (2d Cir.1985). The award stated that "[w]here questions of substantive law have arisen, the panel has looked to the law of the State of Ohio in reaching its determination." Award at 7. The panel never even mentioned the Ohio law on calculating lost profit projections, and it certainly did not proceed either explicitly or implicitly to ignore that law.

Furthermore, there is ample evidence in O'Connell's testimony that he did *not* ignore the actual performance of Cranston/Prescott in projecting future revenues. *See, e.g.,* Transcript at 4874 (testifying that he had reviewed financial informa-

tion "of the Cranston/Prescott operation after the merger as well as ... deal files from the merged firms of Cranston/Prescott"); *id.* at 4876 ("the post-merger deal files were one of the sources of information that we used in making the damage calculations"); *id.* at 4933 (describing his methodology as one that "takes a look at historical results prior to the merger. It takes a look at historical results after the merger, and it also takes a look at industry data available for this specific industry."). So even if it were relevant what methodology O'Connell used—and we believe that, for the purposes of evaluating the panel's award, it is not relevant—it appears from the undisputed testimony that his methodology did in fact incorporate actual historical experience.

Under Ohio law, lost profits may be recovered in a breach of contract action if "profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc. v. International Harvester Co.*, 466 N.E.2d 883, 887 (Ohio 1984). As to the third prong, lost profits may be established "with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 555 N.E.2d 634, 640 (1990). These are precisely the tools Kanuth used to prove his lost profits; it was up to the panel to decide whether he proved them with "reasonable certainty." The panel did not manifestly disregard the law, and we shall not disturb its award.

### III. Conclusion

For the reasons stated above, the judgment of the district court is affirmed.

*It is so ordered.*