Edward J. LOPATA, Appellant,

v.

John T. COYNE, et al., Appellees.

Nos. 96–CV–936, 96–CV–937.

District of Columbia Court of Appeals.

Argued April 7, 1998.

Decided Aug. 5, 1999.

Edward J. Lopata, pro se.

Michael Nussbaum, Washington, DC, for appellees.

Before WAGNER, Chief Judge, and STEADMAN and REID, Associate Judges.

WAGNER, Chief Judge:

This action involves a dispute between appellant, Edward J. Lopata, and the remaining members of a law firm in which he was formerly a partner, Jordan Coyne Savits & Lopata, now Jordan Coyne & Savits ("JCS" or "the partnership"). The parties submitted to arbitration disputed issues related to the circumstances surrounding the termination of the parties' former partnership relationship and the amounts due and owing between them. In this appeal, Lopata challenges an order of the trial court denying his motion to vacate, modify or correct the arbitration award and dismissing with prejudice his complaint for a judicial determination that the partnership dissolved when he was forced out, rather than upon his voluntary withdrawal, thereby entitling him to additional benefits upon dissolution. He argues for reversal on the grounds that: (1) the court has subject matter jurisdiction over dissolution of the partnership notwithstanding the arbitrator's award; (2) the arbitrator's apparent determination that he was a voluntary withdrawing partner is contrary to the law and evidence;

(3) "evident partiality" on the part of the arbitrator requires vacation and/or modification of the arbitrator's award; (4) the arbitrator miscalculated his capital account; and (5) the amount of the arbitrator's award and the judgment entered by the trial court is null and void. We affirm.

## I.

The law partnership of JCS was formed in July 1975, with its main office in Washington, D.C.[1] Starting in about 1987 until his departure from the firm, Lopata practiced out of the firm's Baltimore, Maryland office. From its inception, the partnership was governed by a written partnership agreement, which was amended from time to time. Lopata signed amended agreements in 1975, 1978, 1988, and 1990. However, he refused to sign amendments in 1991 and 1993, although he continued to practice law with the firm until August 31, 1993.

Both the 1990 and the 1993 partnership agreements contained arbitration clauses.[2] Both agreements also provided that in the event that any provision of the agreement contravened any provision of Title 41 (the Uniform Partnership Act) ("UPA"), the agreement would control, and the parties waived any benefits which the UPA might otherwise provide.[3] Such provisions appeared in every partnership agreement since 1984.

In 1992, JCS hired a management consultant to review the firm's partnership agreement and management practices. The consultant recommended that the partnership amend its 1991 agreement with respect to payments to withdrawing and retiring partners because the benefits were too great, and JCS could not afford the level of benefits provided in the 1991 agreement. The consultant recommended that the 1991 agreement be amended to "state specifically that a partner owns no interest in accounts receivables or work in process and that when a partner leaves voluntarily, he gets only a return of capital (without interest) and earned and unpaid compensation." Lopata refused to agree to the recommended changes because, he contended, it would affect significantly ownership interests of the partners and reduce retirement, death and disability benefits which were secured under the January 1990 partnership agreement. In response to the study and recommendations, the partners, with the exception of Lopata, decided to scale back retirement benefits to a more affordable rate and to

1. At the time, the firm was known as Jordan Coyne Savits & Lopata. For convenience, the partnership is referred to in this opinion as "JCS".

2. The arbitration clause in the 1990 agreement reads as follows:

 Any controversy or claim arising out of or relating to any provision of this document or the breach thereof, shall be settled by arbitration in accordance with the rules then in effect of the American Arbitration Association to the extent consistent with the laws of the District of Columbia.

 The arbitration clause in the 1993 agreement reads as follows:

 Any controversy or claim arising out of or relating to any provision of this document or the breach thereof, shall be settled by binding arbitration in accordance with the rules then in effect of the American Arbitration Association. A Partner or the Partnership must initiate the arbitration process within one-hundred twenty (120) days after

notice of the circumstances giving rise to the controversy or claim. Each side shall bear its own costs and expenses in any arbitration.

3. Both the 1990 and 1993 provisions read as follows:

 All provisions of this document shall be construed, shall be given effect and shall be enforced according to the Laws of the District of Columbia. Notwithstanding the foregoing, the partners specifically intend that, to the extent that any provision of this agreement may arguably contravene any section of Title 41 of the District of Columbia Code, the provisions of this agreement shall be controlling. All partners expressly acknowledge by their signature hereto that they have reviewed Title 41 and intend to waive any benefit which its provisions may arguably provide that are not contained within this agreement.

reduce funded death benefits.[4] The 1993 agreement provided for withdrawing partners to receive their capital account only; however, retiring partners would receive their capital account, plus the amount of their partnership draw for the year in which the notice of retirement was given, payable over a two-year period. The 1993 agreement also provided that refusal to sign an approved agreement would constitute cause for expulsion from the firm.

In a memorandum to the partners dated March 17, 1993, Lopata objected to the 1993 amendment, arguing that it was an attempt to take away vested property rights arising under prior agreements. Lopata further informed his partners that he would dissolve the partnership unilaterally if the other partners signed the proposed amendment. On March 24, 1993, eleven of the twelve partners eligible to vote approved the amendments. They also voted to allow Lopata thirty days to sign the new agreement or to withdraw. Subsequently, they extended the deadline, first to July 30, 1993, and then to August 31, 1993. Lopata still would not sign the agreement. At the direction of the remaining partners, Lopata vacated the partnership's offices on August 31, 1993. The remaining partners continued to practice law together under the firm name of Jordan Coyne & Savits.

At that time, the Baltimore office was in the first year of a five-year lease. Testimony presented during the arbitration hearing indicated that the Baltimore office was opened to accommodate Lopata and his asbestos litigation practice. JCS was unsuccessful in subleasing the Baltimore office space, but negotiated a lease buyout. Under the terms of the 1990 and 1993 agreements, Lopata was liable for a portion of the cancellation fees.[5] After settlement negotiations failed to resolve the parties' several disputes, on December 17, 1993, JCS filed a demand for arbitration with the American Arbitration Association ("AAA"). JCS sought to enforce the terms of the 1993 partnership agreement which provided for a withdrawing partner to receive his capital account. About January 6, 1994, Lopata filed a demand for arbitration against JCS. In his claim for relief, Lopata sought the value of his pro rata ownership interest in the partnership and damages for breach of fiduciary duty, breach of the 1990 agreement, and for wrongful dissolution of the partnership. Lopata sought an additional $458,000 as his equity interest in the firm, and damages in the amount of $1,058,000 for breach of duty, or alternatively, a withdrawal payment of his net income for his last full year as provided for in the 1990 partnership agreement. JCS sought a determination of the additional amounts, if any, beyond Lopata's capital account, owing to Lopata and a portion of the lease cancellation fee incurred as a result of Lopata's withdrawal. JCS claimed that nothing more was due to Lopata under the 1993 agreement, or alternatively, that JCS owed only the amounts due under the 1990 agreement.

After an evidentiary hearing and the submission of legal memoranda, the arbitrator issued an award on November 28, 1994.[6] The arbitrator apparently determined that the 1990 agreement was binding on the parties and awarded Lopata an amount to which a withdrawing partner would be entitled. The arbitrator awarded

---

**4.** In exchange, each partner was permitted to increase his draw in order to purchase more life insurance.

**5.** Pursuant to the 1990 and 1993 partnership agreements, a withdrawing partner who takes at least 5% of the gross income of the firm, is liable for a portion of the damages caused by a lease cancellation within 12 months of the withdrawal. There was evidence that upon departure, Lopata took with him his clients which accounted for 14% of the firm's business.

**6.** The arbitrator, Warren Wickersham, was initially rejected by Lopata because of his past partnership association with JCS's legal counsel, but the parties later agreed to permit Mr. Wickersham to arbitrate the dispute.

Lopata $250,941 plus an additional $411.60 on the counterclaim. JCS was awarded $29,318 related to the lease cancellation. Finally, the award allocated ten percent of arbitration expenses for payment by JCS, and ninety percent for payment by Lopata.

On February 24, 1995, Lopata filed in Superior Court a Motion/Application to Vacate and/or Modify or Correct Arbitrator's Award of November 28, 1994. While the motion was still pending, he filed a complaint in the trial court against the JCS partners seeking a judicial determination that they had wrongfully dissolved the partnership of Jordan Coyne Savits & Lopata on September 1, 1993. By order dated June 18, 1996, the trial court denied Lopata's motion, confirmed the arbitrator's award, dismissed with prejudice the complaint, and entered judgment in the amount of $2,229.89 for JCS and against Lopata.[7]

## II.

Lopata argues that the determination of whether the partnership had been dissolved is an issue for the court, not the arbitrator. He contends that, as a matter of law, either the partnership was dissolved under the District's UPA, or the court retains jurisdiction to declare that the partnership has been dissolved pursuant to D.C.Code §§ 41–128, –130, and/or –131 (1990). Further, he argues that the UPA does not provide for "a waiver of a partner's right to seek a declaration that a dissolution of a partnership occurred prior to or subsequent to any party filing for arbitration." JCS counters that Lopata is foreclosed from challenging the arbitrator's consideration of dissolution because he agreed to have the issue decided by arbitration, and his participation in the arbitration on the merits of the dispute forecloses the issue of arbitrability after the arbitrator has rendered a decision. The trial court rejected Lopata's argument

that the arbitrator lacked authority to examine dissolution questions because Lopata specifically demanded dissolution rights in his arbitration application and raised an objection only after he received an adverse award.

■■■ It is within the jurisdiction of the courts to determine whether parties have agreed to arbitrate a particular question, unless the parties submit the issue of arbitrability for arbitration. *See Masurovsky v. Green,* 687 A.2d 198, 204 (D.C.1996) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943–44, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). In making that determination, we apply state-law principles applicable to the formation of contracts. *Id.* (citation omitted). That is because " 'arbitration is . . . a matter of contract between the parties: it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.' " *Id.* at 205 (quoting *Kaplan,* 514 U.S. at 943, 115 S.Ct. 1920). Both the 1990 and the 1993 agreements involved here contained arbitration provisions. Lopata signed the 1990 agreement which provided that the parties agreed to arbitrate "[a]ny controversy or claim arising out of or relating to any provision" of the partnership agreement. The issue as to whether Lopata withdrew from the partnership or was expelled involuntarily related to the partnership, and the resolution was determinative, at least in part, of the rights and the obligations of Lopata and JCS thereafter. These issues appear to fall within the purview of the arbitration clauses.

■■■ Upon a finding of the existence of an enforceable arbitration clause, a presumption in favor of arbitration attaches. *See Masurovsky, supra,* 687 A.2d at 205. Here, it is unmistakable that the parties agreed to submit all claims between them to arbitration, not only from their agree-

---

7. The order identified the defendants to be "the other partners" in the law firm of Jordan Coyne Savits & Lopata. The judgment of

$2,229.89 was reimbursement due to JCS for Lopata's share of the arbitration expenses.

ment, but also from the positions taken by them during arbitration. At the commencement of the arbitration hearing, counsel for Lopata requested that both sides make clear whether they would or would not submit all claims to arbitration. Both sides agreed, with Lopata's attorney, Mr. Greensfelder, initially reserving the right to argue "any public policy limitation just as a technicality." Following the hearing, the parties again addressed the issue, and counsel for Lopata stated that he had heard nothing which would form the basis for a public policy exception, and essentially, that the arbitration of the issues made unnecessary resort to the courts for consideration of the issues arbitrated.[8] Thus, it is clear that the parties intended that all aspects of their dispute be submitted for determination by the arbitrator.

■ Where no objection is raised to the arbitrability of an issue, the court will not review the issue. It is well-settled that " 'a party may not submit a claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result.' " *Nghiem v. NEC Electronic, Inc.*, 25 F.3d 1437, 1440 (9th Cir.1994), *cert. denied*, 513 U.S. 1044, 115 S.Ct. 638, 130 L.Ed.2d 544 (1994) (quoting *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1357 (9th Cir.1983)). Similarly, "[o]nce a claimant submits to the authority of the arbitrator and pursues arbitration, he cannot suddenly change his mind and assert lack of authority." *Id.* Here, Lopata sought resolution of his claims through arbitration and participated in the arbitration proceeding. His "participation in the hearing without raising the issue of arbitrability waived any defense to confirmation of the award against him as void on the basis of a lack of an agreement to arbitrate." *Jaffe v. Nocera*, 493 A.2d 1003, 1010 (D.C.1985) (footnote omitted). Lopata cannot now object to the arbitrator's award simply because he disagrees with the result.

■ Nevertheless, Lopata argues that the determination of whether a partnership has been dissolved under the UPA is a matter of public policy for which the courts cannot be ousted of jurisdiction by agreement of the parties. In support of his position, he relies principally upon two cases in this jurisdiction, *Spencer v. Spencer*, 494 A.2d 1279 (D.C.1985) and *Blumenthal v. Blumenthal*, 155 A.2d 525 (D.C. 1959). Both cases recognize that the court retains jurisdiction to determine child support for a minor child in spite of the parent's agreement or arbitration of the issues. *Spencer*, 494 A.2d at 1285, *Blumenthal*, 155 A.2d at 526–27. By statute, issues of custody and support remain open for future court orders. *See* D.C.Code § 16–914 (1997). Although agreements are generally enforceable, absent fraud, duress or concealment, when issues of sup-

---

8. The parties stated on the record the following:

> Mr. Nussbaum: [T]he one thing I do wish to have clarification on is whether there is anything relating to the differences between Mr. Lopata and the Jordan Coyne law firm that are left out at sea after this arbitration. I became concerned during the opening after there was a consultation between Mr. Greensfelder and Mr. Lopata, and there was some reservation made about public policy that I didn't quite understand. One thing I would like some comfort on is that whatever happens, that neither you nor we go off to Superior Court and start litigation anew.
> Mr. Greensfelder: You are not going to see me in the Superior Court.
> Mr. Nussbaum: Maybe I have the wrong court.
> Mr. Greensfelder: Or the District Court or the Circuit Court for Anne Arundel County. Let me talk to you about that. We don't need to hold things up here. I think I heard [the arbitrator] say if there were any evidence that would support a claim for public policy exception to the arbitration provision that I would be duty bound to stand up and say so, and I haven't heard it.
> Mr. Nussbaum: That makes me feel a little bit better, and the time to hear it has gone by, I guess is what I'm wishing to hear.
> Mr. Greensfelder: I think you are right.

port and custody of minor children are in question, the court is obligated to act in the best interest of the children. *See Cooper v. Cooper,* 472 A.2d 878, 880 (D.C. 1984). Thus, where "the best interests of the children are threatened in a material way by circumstances unforeseen at the time of the agreement it is reasonable for a court to entertain a request for modification of either custody or support provisions." *Id.* The statutory and policy reasons for this rule, which protects the rights of minor children with respect to their parent's obligation to them, is on a very different footing than contracts governing business dealings between adults who can protect themselves.

■■■■ "It is well settled that an arbitration award may not stand if it contravenes paramount considerations of public policy." *City of DeKalb v. International Ass'n of Fire Fighters, Local 1236,* 182 Ill.App.3d 367, 131 Ill.Dec. 492, 538 N.E.2d 867, 870 (2d Dist.1989). This rule is grounded in the principle that courts will not enforce an illegal act or a contract which violates public policy. *Id.* However, the statute governing partnerships in this jurisdiction at the time pertinent hereto does not reflect a particular public policy against agreements or arbitration of issues related to the nature of the termination of the relationship or to ascertainment and disposition of a partner's property interests upon termination.[9] Lopata contends that, contrary to the trial court's holding, with the exception of D.C.Code §§ 41–117, –118, –124, and –137, the rules governing partnerships are not subject to agreement between the parties.[10] Each of the cited provisions of the statute set forth specific rights and/or responsibilities of a partner with the proviso that they are "subject to any agreement between [the

partners] ...." The omission of similar language from the dissolution provisions, Lopata contends, precludes the parties from making agreements with respect thereto. *See* D.C.Code §§ 41–129 to 41–136. The language in these sections of the statute do not expressly prohibit the parties from submitting to arbitration claims related to termination of their relationship. Absent an explicit prohibition, there is no reason for assuming that parties cannot agree upon terms for dissolution of the partnership. *See Cooper v. Isaacs,* 145 U.S.App. D.C. 279, 283, 448 F.2d 1202, 1206 (1971) (recognizing that parties, by agreement, may change what effects a dissolution); *Day v. Sidley & Austin,* 394 F.Supp. 986, 992 (D.D.C.1975) (generally, statutory standards governing partnership relationships can be overridden by agreement of the parties). The refusal to enforce the arbitrator's decision on public policy grounds requires "'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (quoting *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)) (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)) (internal quotation marks omitted). We are not persuaded that a dominant and well-defined public policy is expressed in the former UPA which precludes enforcement of the parties' agreement to submit their differences surrounding the termination of their relationship to arbitration.

Lopata relies upon the decision in *DeKalb, supra,* in support of his position that

---

9. The law governing uniform partnerships in the District of Columbia, D.C.Code §§ 41–101 to 41–148, which is relevant to this case, was repealed effective January 1, 1998. The Uniform Partnership Act of 1996, D.C.Code §§ 41–151.1 to 41–162.3 became effective April 9, 1997.

10. These provisions are in the repealed statute which was in effect at the time relevant to the issues in this case. Unless otherwise stated, all references to Partnership Act (or UPA) are to the repealed statute.

the arbitrator's award does not defeat subject matter jurisdiction of the court with respect to dissolution of the partnership. In *DeKalb*, the Illinois appellate court determined that the trial court erred in dismissing the amended complaint of the city of DeKalb seeking to vacate an arbitrator's award which contravened a state statute. 131 Ill.Dec. 492, 538 N.E.2d at 870. An arbitrator had ordered the city to pay two firefighters pay differential as provided for in their collective bargaining agreement, although it contravened the amount of benefits set by statute. *Id.* 131 Ill.Dec. 492, 538 N.E.2d at 868. The collective bargaining agreement provided that decisions of an arbitrator on matters submitted to arbitration would be final. *Id.* 131 Ill.Dec. 492, 538 N.E.2d at 868–69. Since the arbitration award in Lopata's case does not contravene any statutory provision, *DeKalb* is not authority persuasive of his position.

In this case, the parties' dispute centered around the termination of Lopata's relationship with his law firm and the rights upon termination of that arrangement. That determination was dependent, in part, upon the manner in which that change of relationship was brought about. All of these issues arose out of, and related to, the partnership which was governed by agreement. Both the 1990 agreement, which was the last Lopata signed, and the later amended agreement provided for such issues to be submitted to arbitration. Lopata did not challenge the arbitrability of the issues, but rather availed himself of this dispute resolution mechanism. *See Jaffe, supra,* 493 A.2d at 1008–09. He sought a determination of whether he had been wrongfully expelled from the partnership and whether he was entitled to additional assets. Essentially, he consent-

ed to the arbitrability of issues involving the parties' rights upon dissolution. *Id.* at 1010–11. Moreover, he indicated, through counsel, that he did not object to the arbitrability of the issue. A challenge to the authority of the arbitrator over the issue only after an unfavorable result comes too late. *Id.* at 1011; *Nghiem, supra,* 25 F.3d at 1440; *compare Grad v. Wetherholt Galleries,* 660 A.2d 903, 906 (D.C.1995) (holding that party who participates in arbitration *over objection,* is not barred from raising the issue after the award). In any event, the trial court passed upon the question of arbitrability and concluded that the challenged issue was properly before the arbitrator. *See Poire v. Kaplan,* 491 A.2d 529, 533 (D.C.1985) (whether an issue is arbitrable is a question of law for the courts). Therefore, we find no error in the trial court's ruling in this regard.

### III.

Lopata argues that the arbitrator's award treating him as a voluntary withdrawing partner is contrary to the evidence and law, and therefore must be vacated. In support of this argument, Lopata claims that he was forced out of the partnership in that he did not take any of the actions set forth in the partnership agreement which amount to a withdrawal from the partnership. He also argues that the proposed 1993 amendment violated D.C.Code § 41–117(8) [11] in that consent from all the partners was necessary to change the partnership agreement. In support of this argument, Lopata contends that JCS wanted to continue the practice under a fundamentally different agreement. He contends that the 1993 agreement violated D.C.Code §§ 41–123 and –125 [12] by

---

11. D.C.Code § 41–117(8) reads as follows:

> The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>> Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the

partners; but no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners.

12. D.C.Code § 41–123 reads as follows:
> The property rights of a partner are:
> (1) His rights in specific partnership property;

"extricating a forfeiture of earned revenues during a partner's active tenure and participation in the partnership." He claims entitlement under § 41–137, as an expelled partner, to his equity interest, including his pro rata share of unbilled and billed and uncollected fees and expenses. He asserts that it was error to charge him with any portion of the cancelled lease, as such liabilities are not chargeable to him under § 12(c) of the applicable agreement.

Judicial review of an arbitrator's decision is extremely limited, and a party seeking to set it aside has a heavy burden. *See Celtech, Inc. v. Broumand,* 584 A.2d 1257, 1259 (D.C.1991) (citing *Stern v. Stern Co. of Washington, D.C.,* 91 U.S.App. D.C. 338, 200 F.2d 364 (1952)). The grounds for setting aside an arbitration award are specified by statute. *See* D.C.Code § 16–4311.[13] In *Shaff v. Skahill,* 617 A.2d 960, 962–63 (D.C.1992), we held that the trial court erred in denying a motion to confirm an arbitration award where no statutory ground had been alleged for vacating it. However, we have observed that a court may "inquire" whether the arbitrator's decision is arbitrary or capricious. *See Celtech,* 584 A.2d at 1258. It has been held elsewhere that "[w]hen a claim arises under specific laws, ... the arbitrators are bound to follow those laws *in the absence of a valid and legal agreement not to do so." Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456, 1459 (11th Cir.1997) (emphasis added). Where it appears that the arbitrator

manifestly disregarded the law, court inquiry may be undertaken. *See Kanuth v. Prescott, Ball & Turben, Inc.,* 292 U.S.App. D.C. 319, 323, 949 F.2d 1175, 1179 (1991) (citing *Koch Oil, S.A. v. Transocean Gulf Oil Co.,* 751 F.2d 551, 554 (2d Cir.1985)). In *Shaff,* there was a claim that the arbitrator's decision was based on an error of law, and this court reversed denial of the appellant's motion for confirmation of the award on the basis that no statutory ground had been alleged to vacate the arbitrator's award. 617 A.2d at 962–63. Thus, there may be some question concerning the extent to which this court's review will be predicated upon an error of law by the arbitrator, particularly if the decision does not approach being arbitrary and capricious.[14] "[T]his court, however, will not review an arbitration award on the merits." *Poire, supra,* 491 A.2d at 534 (citing *Sindler v. Batleman,* 416 A.2d 238, 242 (D.C.1980); *Revere Copper & Brass, Inc. v. Overseas Private Inv. Corp.,* 202 U.S.App. D.C. 81, 83–84, 628 F.2d 81, 83–84, *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980)). With these principles in mind, we consider Lopata's argument that the award should be set aside because of an error of law.

We can only speculate as to the reason for the arbitrator's award because no opinion accompanied it. An arbitrator is not required to explain the reason for a damage award. *See Kanuth, supra,* 292 U.S.App. D.C. at 323, 949 F.2d at 1179 (citing *Sargent v. Paine Webber Jackson &*

---

(2) His interest in the partnership; and
(3) His rights to participate in the management.
D.C.Code § 41–125 reads as follows:
A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property.

**13.** D.C.Code § 16–4311 provides insofar as relevant to the issues presented here that:
(a) Upon application of a party, the Court shall vacate an award where: ...
(2) There was evident partiality by an arbitrator ... or misconduct prejudicing the rights of any party;
(3) The arbitrators exceeded their powers;

. . .
(5) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 16–4312 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a Court of law or equity is not ground for vacating or refusing to confirm the award.

**14.** We need not here definitively resolve this issue, since Lopata cannot prevail under any recognized standard.

*Curtis, Inc.,* 280 U.S.App. D.C. 7, 10, 882 F.2d 529, 532 (1989), *cert. denied,* 494 U.S. 1028, 110 S.Ct. 1474, 108 L.Ed.2d 612 (1990)). "[A]n explanation requirement would unjustifiably undermine the speed and thrift sought to be obtained by the 'federal policy favoring arbitration.'" *Sargent,* 280 U.S.App. D.C. at 10, 882 F.2d at 532 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *see also Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (observing that arbitral awards may be made without explanation). In *Shaff, supra,* this court gave apparent sanction to this principle. 617 A.2d at 962 n. 6. "'If a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'" *Wall Street Assocs. L.P. v. Becker Paribas, Inc.,* 818 F.Supp. 679, 686 (S.D.N.Y.1993) (quoting *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1216 (2d Cir.1972)).

■■■ There is no showing here that the arbitrator manifestly disregarded the law. An examination of the parties' positions at arbitration and the arbitrator's disposition will make this clear. Lopata argued that the arbitrator should apply the UPA or the 1990 partnership agreement. The partnership argued that the 1993 agreement should apply, which would have produced a lesser sum than the arbitrator awarded Lopata. Alternatively, the partnership requested that the arbitrator apply the 1990 agreement. The arbitrator apparently determined that Lopata was a withdrawing partner under the 1990 partnership agreement, given the awards of $250,941 to Lopata and $29,318 to JCS for the lease cancellation. Under the 1990 partnership agreement, a withdrawing partner was entitled to payment of his capital accounts receivable and unbilled time. That agreement also provided that a withdrawing partner would be liable, among other things, for damages caused the partnership by lease cancellation where he left with client matters that constituted 5% or more of the gross income of the firm for the last calendar year. There was evidence that Lopata left with clients which accounted for 14% of the firm's business.

Lopata contends that he could not be deemed to have withdrawn because he did not give written notice to the partnership to that effect or notice at a partnership meeting as required by the 1990 partnership agreement. Although the withdrawing partner had a duty to give such notice under the agreement, his failure to do so need not necessarily be determinative of whether the partner withdrew voluntarily. Here, there was other evidence having a bearing on that subject which the arbitrator could have taken into consideration in making the determination. Although Lopata never signed the 1991 amendment, he remained with the partnership for the next two years. Thus, his failure to sign an amended agreement had not previously triggered his departure. He testified that he had been exploring other law firm possibilities between 1989 and 1993. In late summer or fall of 1992, he started negotiations with the firm he finally joined in 1993. The JCS partners approved taking him back if he changed his mind. Lopata conceded that he was not expelled, although he contended that he was forced out. The arbitrator could have concluded based upon the evidence that Lopata left to improve his position, rather than because the latest amended agreement left him no choice. As a withdrawing partner, Lopata's rights would be appropriately determined under the partnership agreement. *See* D.C.Code §§ 41–117, –137 (partner's rights and duties in relation to the partnership, including rights on dissolution, may be subject to any agreement between them); *see also Montes, supra,* 128 F.3d at 1459 (arbitrator bound to follow the law, absent a valid agreement to the contrary); *Day, supra,* 394 F.Supp. at 992 ("Generally, common law and statutory standards concerning relationships between partners can be overridden by an agreement reached by the parties themselves."). In light of the foregoing facts

and legal principles, however they may be formulated, we cannot say that the arbitrator's apparent determination that Lopata was a withdrawing partner provides any basis for setting aside the award.[15]

## IV.

 Lopata argues that the arbitrator's award was based on evident partiality in that the arbitrator deliberately disregarded both statutory and case law, as well as the undisputed facts presented during the arbitration hearing. D.C.Code § 16–4311(a)(2) provides that an arbitrator's award shall be vacated where "[t]here is evident partiality by an arbitrator appointed as a neutral . . . ." The party alleging partiality has the burden of proving " 'specific facts which indicate improper motives' on the part of the arbitrator ." *Celtech, supra,* 584 A.2d at 1259 (quoting *Sheet Metal Workers Int'l Ass'n, Local Union No. 420 v. Kinney Air Conditioning Co.,* 756 F.2d 742, 745 (9th Cir.1985)). Generally, evident partiality " 'is confined to situations where the arbitrator has had dealings or relationships with one of the parties that might cause him to be biased.' " *Id.* (quoting *Reichman v. Creative Real Estate Consultants, Inc.,* 476 F.Supp. 1276, 1284 (S.D.N.Y.1979)). For this reason, "courts have repeatedly rejected claims by parties dissatisfied with the results of arbitration proceedings that certain rulings can only be explained by the arbitrators' evident partiality." *Id.* (citations omitted).

 Here, Lopata agreed to the arbitrator with knowledge of any prior dealings between the arbitrator and JCS's legal counsel.[16] Lopata essentially offers as the basis for his claim that the arbitrator's award was contrary to the undisputed evidence and in deliberate disregard of the law. " 'The mere fact that arbitrators are persuaded by one party's arguments and choose to agree with them is not of itself sufficient to raise a question as to the evident partiality of the arbitrators." ' *Celtech, supra,* 584 A.2d at 1259 (quoting *Fairchild & Co., Inc. v. Richmond, F. & P.R. Co.,* 516 F.Supp. 1305, 1313 (D.D.C. 1981)). For the reasons stated in the preceding sections, we are not persuaded that the arbitrator's decision on the merits was so contrary to the law and evidence that evident partiality can be inferred. Moreover, "[t]o permit 'evident partiality' to be inferred from the arbitrator's decision on the merits would undercut the restrictions on judicial review of arbitration proceedings for error of fact and law." *Id.* at 1259. In any event, "such an inference of bias could be drawn from an alleged departure from correct legal principles, if at all, only in extreme and unusual circumstances." *Id.* at 1260. Such circumstances have not been shown here. Lopata has failed to allege specific facts which would indicate improper motives on the part of the arbitrator. For these reasons, we reject this argument.

## V.

 Lopata argues that the arbitrator miscalculated his capital account, and therefore, the award must be modified to correct the error. He claims that his former partners failed to include his share of accounts receivable in calculating his

---

**15.** We reject Lopata's argument that unanimous approval was required to effect such a fundamental change as the 1993 amendment which reduced payments to retiring or withdrawing partners. The 1990 agreement provided for amendments to the partnership agreement upon a vote of three-fourths of the total shares. A unanimous vote is not required where the parties' agreement provides for changes of this type by a three-fourths majority. *See Day, supra,* 394 F.Supp. at 993.

**16.** During the trial court proceeding, Lopata asserted as grounds for vacatur of the arbitrator's award the fact that the arbitrator had a past relationship with JCS's counsel. However, the trial court found that there was no evident partiality in that the past relationship, which existed over twenty years ago, was fully disclosed to Lopata, the arbitrator had no financial stake in the outcome, and Lopata consented to the arbitrator.

capital account, thereby depriving him of his property rights pursuant to D.C.Code §§ 41–123, –125, and –137.[17] He further claims that if he is to be treated as a withdrawing partner, then the court should modify the arbitrator's award to include a percentage share of the accounts receivables.[18] This issue was fully presented to the arbitrator for consideration. It was an arbitrable issue for which the arbitrator rendered a decision on the merits. The merits of an arbitration decision are generally not subject to review. *See Poire, supra,* 491 A.2d at 534. Only on exceptional grounds, such as gross mistake, will a court interfere with an arbitration award; "an error of judgment will not do." *Celtech, supra,* 584 A.2d at 1258 (quoting *Mancuso v. L. Gillarde Co.,* 61 A.2d 677, 678–79 (D.C.1948)). Lopata has not shown this case to fall within the statutory grounds for vacating the award nor any other exceptional grounds.[19] See *id.*; see also D.C.Code § 16–4311.

## VI.

■ Finally, Lopata argues that the trial court erred in confirming the arbitration award in favor of JCS because: (1) his dispute is with individual partners of JCS and not the partnership entity; and (2) a partnership cannot be sued as a separate legal entity. Therefore, he contends that the partnership has no legal right or remedy and that the arbitrator's award of $29,-318 and the judgment of $2,229.89 in favor of JCS must be vacated. It is true that at the time this case was filed a District of Columbia partnership could not sue or be sued as a separate legal entity.[20] *See Fennell v. Bache,* 74 U.S.App. D.C. 247, 248, 123 F.2d 905, 906 (1941), *cert. denied,* 314 U.S. 689, 62 S.Ct. 359, 86 L.Ed. 551 (1941). Lopata indicates that he made the individual partners parties to the arbitration proceeding, which was consolidated with JCS's demand for arbitration. Similarly, he joined the partners as parties in the Superior Court proceeding. The error, if any, in confirming the arbitration award and entering judgment for costs in favor of "defendants" against Lopata for $2,229.89 is harmless and does not invalidate the award. That the arbitrator's award names JCS as the claimant is a harmless, technical error which does not invalidate the award.[21]

For the foregoing reasons, the judgment appealed from is hereby

**17.** D.C.Code § 41–137 reads in relevant part as follows:

(a) When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his co-partner and all persons claiming through them in respect to their interests in the partnership, unless otherwise agreed, may have the partnership property apply to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. . . .

**18.** Lopata contends that he had a least a 10.06 percentage interest in the then total accounts receivables of $5,234,763.98 ($3,270,546.06 unbilled legal fees and expenses; $1,964,217.92 billed and uncollected legal fees and expenses). Therefore, he contends he is entitled to an additional award of $526,617.25 plus interest.

**19.** As the trial court observed:

The calculation of the capital account balance, along with the other issues, was fully litigated before the Arbitrator. In the arbi-

tration proceeding, [Lopata's] expert ignored the partnership agreement and contended that the capital account balance should have been calculated on an accrual basis, while [JCS] relied on the partnership agreement and contended that the capital account balance should be calculated on a cash basis. The correct accounting method is properly left to the arbitrator and is not within the limited statutory role given this court when an arbitration award has been challenged.

**20.** Under the Uniform Partnership Act of 1996, "[a] partnership may sue or be sued in the name of the partnership." D.C.Code § 41–153.7(a) (1998).

**21.** This is especially so since there is no indication that anyone understood the dispute to be with anyone other than the individual partners of the Jordan Coyne Savits & Lopata partnership.

*Affirmed.*[22]

**22.** The trial court may, upon application of either party, determine whether a substitution of parties to identify the real parties in interest is required.