# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 18, 2005       Decided July 18, 2006

No. 05-7017

DAVID S. KURKE,
APPELLEE

v.

OSCAR GRUSS AND SON, INC.,
APPELLANT

———

Consolidated with
05-7018, 05-7021

———

Appeals from the United States District Court
for the District of Columbia
(No. 04cv00870)

———

*Robert S. Churchill* argued the cause for appellant/cross-appellee Oscar Gruss and Son, Inc. With him on the briefs was *Lisa Freiman Fishberg. Barry Coburn* entered an appearance.

*Daniel M. Press* argued the cause and filed the brief for appellee/cross-appellant Philip Wagenheim.

*Richard A. Stephens* argued the cause and filed the brief for appellee David S. Kurke.

Before: GINSBURG, *Chief Judge*, and GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   Oscar Gruss & Son, Inc., a securities firm, and Philip Wagenheim, an executive at the firm, appeal the district court's confirmation of an arbitration award. The arbitrators required the appellants to pay compensatory damages to David S. Kurke, a former Oscar Gruss customer, for subjecting his account to unauthorized trading and churning. The appellants maintain that the arbitrators awarded Kurke damages in manifest disregard of the law.  We disagree.

I

David Kurke opened a securities account with Oscar Gruss in 1997.  Upon opening the account, Kurke signed a margin agreement providing that "statements of my account shall be conclusive if not objected to in writing" within a specified period after transmittal.  J.A. 396.  Kurke invested a total of $520,000 in the account, and he received monthly statements. Kurke's account was profitable for the first two and a half years of its existence.  Indeed, the statement for the month ending December 31, 1999, revealed a balance of approximately $1,007,000.  By the time Kurke closed the account on April 30, 2000, however, the balance had dwindled to $39,000.

In January 2003, Kurke filed a National Association of Securities Dealers, Inc. (NASD) arbitration claim against the Oscar Gruss firm and Philip Wagenheim, alleging the following causes of actions:  "unauthorized trading, churning, breach of

fiduciary duty, fraud, breach of contract, NASD Conduct Rule violations, negligence, negligent supervision, respondeat superior, and Securities Exchange Act violations." *In re Arbitration Between David S. Kurke and Oscar Gruss & Sons, Inc.*, No. 03-00749, 2004 WL 1207231, at *1 (NASD May 21, 2004) (italicization omitted). Kurke sought $1,600,000 in compensatory damages and $2,000,000 in punitive damages. Oscar Gruss denied Kurke's allegations and asserted, inter alia, the affirmative defenses of ratification and failure to mitigate damages. Wagenheim also denied the allegations, and further contended that he could not be held liable for the conduct of Kurke's broker on a respondeat superior theory because he neither supervised the broker nor owned the company.

The arbitration panel heard testimony in April and May of 2004. Kurke testified that he and his wife were co-owners of a small executive search firm. Although he had fifteen years of investing experience, Kurke testified that he did not fully comprehend the account statements that came from Oscar Gruss. Some of the options trading information on Kurke's statements, he stated, "was way beyond what [he] could understand." Arbitration Hr'g Tr. at 702 (April 28, 2004). Kurke could, however, decipher the monthly statements well enough to notice that they revealed a high volume of unauthorized transactions during the fall of 1999; Kurke's broker had never sought, and Kurke had never granted, permission for discretionary trading.

Kurke began calling the broker, Christopher Fong, to complain about the unauthorized trades. Kurke testified that, during their conversation, Fong said "he absolutely could not rescind trades." *Id*. at 692. Kurke also testified that Fong told him:

> [H]e couldn't undo buys because they were already there, and "there's nothing [he could] do with them

except sell them at the right time." And he assured me they'd make money. . . . [H]e couldn't undo sales because they were no longer in the possession of the company. He couldn't put them back in my account.

*Id*. According to Kurke, Fong "kept promising me he'd fix it, to trust him, that he could . . . turn this around." *Id*. at 766.

Kurke further testified that he "tried calling [Fong's] manager," but that "nobody seemed to want to deal with it at all." *Id*. In April 2000, Kurke finally spoke with Wagenheim, who represented that he was Fong's superior and an owner of Oscar Gruss. *See id*. at 771-72. Like Fong, Wagenheim told Kurke "that none of the transactions could be undone." *Id*. at 769. Wagenheim also "kept reiterating, 'You really should not . . . liquidate this stuff right now because it's going to come back,'" and "'I can see this account . . . tripling in no time.'" *Id*. at 782.

Geraldine Genco, an expert on securities industry standards, also appeared before the arbitration panel. She testified that, during October and November of 1999, Kurke's account had a turnover rate of over 65 -- more than 10 times the industry standard for unlawful churning of an account. *See id*. at 1156-57 (April 30, 2004); *see also* Genco Aff. ¶ 3 (June 30, 2004).[1] Genco stated that this was "one of the highest excessive trading cases" she had ever seen. Genco Aff. ¶ 3. She further opined that there was unauthorized trading and that "the lack of

---

[1]"Churning occurs when an account has been excessively traded to generate commissions in contravention to the investor's expressed investment goals." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 324 (2d Cir. 2002) (internal quotation marks omitted).

supervision over Mr. Kurke's account was 'intentional' and 'reckless.'" *Id*. ¶ 4.[2]

On May 21, 2004, the arbitration panel awarded Kurke compensatory damages from both Oscar Gruss and Wagenheim. *See Arbitration*, 2004 WL 1207231, at *2. The panel ordered Oscar Gruss to pay Kurke $648,000, plus five percent interest from May 1, 2000, until the amount was paid in full. The arbitrators ordered Wagenheim to pay Kurke $58,000 at the same rate of interest. Kurke's claims for punitive damages and attorneys' fees, however, were denied.

On May 28, 2004, Kurke petitioned the district court for enforcement of the arbitration award; the defendants subsequently filed cross-motions to vacate it. On January 19, 2005, the district court granted Kurke's petition and entered judgment against the defendants for the full amount of the award. *See Kurke v. Oscar Gruss & Son, Inc.*, No. 04-0870, Mem. Op. at 11 (D.D.C. Jan. 19, 2005). This appeal followed.

II

As we have repeatedly recognized, "'judicial review of arbitral awards is extremely limited,'" and we "'do not sit to hear claims of factual or legal error by an arbitrator as [we would] in reviewing decisions of lower courts.'" *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1178 (D.C. Cir. 1991)). The Federal Arbitration Act (FAA), 9 U.S.C. § 10(a), lists only four

---

[2]The arbitration panel also heard from four other witnesses who testified that Fong had defrauded them.

grounds upon which an arbitration award may be vacated.[3] Neither Oscar Gruss nor Wagenheim contends that any of those grounds is applicable here.

In addition to the statutory grounds, "arbitration awards can be vacated . . . if they are in manifest disregard of the law." *LaPrade v. Kidder, Peabody & Co., Inc*., 246 F.3d 702, 706 (D.C. Cir. 2001) (internal quotation marks omitted). This is the ground upon which the appellants urge us to vacate Kurke's award. *See* Appellant Oscar Gruss Br. 3; Appellant Wagenheim Br. 5.[4] "Manifest disregard," however, is an extremely narrow standard of review. It "means much more than failure to apply

---

[3]The four grounds are as follows:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

[4]Arbitration awards can also be vacated "if they are contrary to some explicit public policy that is well defined and dominant and ascertained by reference to the laws or legal precedents." *LaPrade*, 246 F.3d at 706 (internal quotation marks omitted). Neither appellant urges application of that standard here.

the correct law." *Kanuth*, 949 F.2d at 1182.[5] Rather, to vacate an award under that standard, we "'must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether[,] and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *LaPrade*, 246 F.3d at 706 (quoting *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)).

Moreover, when the arbitrators give no explanation for their decision, as commonly occurs in arbitration and as occurred in this case, we must confirm the award "if any justification can be gleaned from the record." *GMS Group, LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir. 2003) (internal quotation marks omitted). "Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003). In light of this "severely limited" standard of review, it should come as no surprise that "obtaining judicial relief for arbitrators' manifest disregard of the law is rare." *Id.* at 389 (internal quotation marks omitted).

We review a district court's confirmation of an arbitration award for clear error with respect to questions of fact and de

---

[5]The next sentence in *Kanuth* reads: "'Manifest disregard' may be found, *for example*, *if* the panel understood and correctly stated the law but then proceeded to ignore it." 949 F.2d at 1182 (emphasis added). During the course of this appeal, the parties have disputed whether the official version of the *Kanuth* opinion contains the above-italicized phrase, "for example, if," or instead contains the words "only if." The parties' confusion is understandable because the Westlaw and Lexis databases have different versions of the opinion. The correct version is that which appears in the first sentence of this footnote.

novo with respect to questions of law. *See LaPrade*, 246 F.3d at 706; *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995). As the parties seeking to vacate the award, Oscar Gruss and Wagenheim "bear[] the burden of demonstrating that the arbitration panel acted in manifest disregard of the law." *LaPrade*, 246 F.3d at 706. We consider Oscar Gruss' arguments in Part III and Wagenheim's in Part IV.

## III

For purposes of this appeal, Oscar Gruss does not dispute that Kurke's account "was churned," that "unauthorized trades occurred" in the account, or that Oscar Gruss and its employees "acted wrongfully." Appellant Oscar Gruss Br. 4. It nonetheless contends that Kurke is barred from recovering the arbitrators' award "as a matter of law." *Id*.

Oscar Gruss proffers two arguments in support of its claim that the arbitration panel's award to Kurke was made in manifest disregard of the law. First, the company contends that, under the terms of his margin agreement, Kurke's failure to object to the unauthorized trades in writing within the stipulated time frame effectively ratified those trades. Second, Oscar Gruss asserts that Kurke's failure to mitigate his damages after he became aware of the unauthorized trading relieves the company of some or all of its liability for Kurke's losses.

## A

Kurke's margin agreement with Oscar Gruss provided as follows: "Reports of the execution of orders and statements of my account shall be conclusive if not objected to in writing addressed to the branch manager of the office servicing such account(s) within five days and ten days, respectively, after transmittal to me by mail or otherwise." J.A. 396. Kurke

concedes that he realized there was unauthorized trading in his account by the fall of 1999 and that he did not object in writing. Oscar Gruss contends that, by this failure to object, Kurke ratified the transactions in his account.

There is, to be sure, substantial authority supporting Oscar Gruss' ratification theory. As the Second Circuit explained in *Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, a case repeatedly cited by Oscar Gruss, "[t]he purpose" of a written notification clause like that at issue here "is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profitable." 936 F.2d 640, 645-46 (2d Cir. 1991). "The writing requirement" also "insures that unauthorized trading disputes are not relegated to 'swearing contests' between broker and customer." *Id*. at 646. "For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction *generally* have been enforced by courts." *Id.* (emphasis added).

But as the Second Circuit's use of the word "generally" suggests, there are exceptions to the rule that ratification agreements will be enforced. *Modern Settings*, itself, listed two. First, "[t]here will be instances where a disparity in sophistication between a brokerage firm and its customer will warrant a flexible application of such written notice clauses." *Id*.; *see Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1200 (8th Cir. 1982) ("When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct."). Second, "a broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall the customer's filing of the

required written complaint." *Modern Settings*, 936 F.2d at 646; *see Widell v. Wolf*, 43 F.3d 1150, 1151 (7th Cir. 1994) (refusing to overturn an arbitration award, despite the customer's failure to object to unauthorized trades promptly after receiving account statements as required by his account agreement, because his broker told him to disregard the statements); RESTATEMENT (SECOND) OF AGENCY § 416 (1958) (stating that ratification is not a defense when the principal "is caused to ratify by the misrepresentation . . . of the agent").

This circuit has suggested a third exception, albeit in a case in which it is unclear whether there was a written notice agreement. In *Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, we held that "[r]atification occurs only when the customer, with full knowledge of the facts, manifests his intention to adopt the unauthorized transaction." 901 F.2d 1124, 1129 (D.C. Cir. 1990). Because the investors in *Merrill Lynch* "were not advised of their right to reject the unauthorized trades," we concluded that "as a matter of law, there could not have been ratification." *Id*.

Evidence supporting all three of these exceptions was before the arbitrators in this case. Although Kurke was not an inexperienced investor, the arbitrators could have credited his testimony that he did not comprehend the highly complicated options trades contained in his monthly account statements. The district court found that "many of Mr. Fong's transactions were 'way beyond what [Kurke] could understand,'" *Kurke*, Mem. Op. at 2-3 (quoting Arbitration Hr'g Tr. at 702 (April 28, 2004)), and we cannot say that this finding was "clear error," *LaPrade*, 246 F.3d at 706.

The arbitrators could also have found "assurances or deceptive acts" that "forestall[ed] the customer's filing of the required written complaint." *Modern Settings*, 936 F.2d at 646.

There is certainly evidence of such lulling, including Fong's "promis[es]" that "he'd fix it," that Kurke should "trust him," and "that he could . . . turn this around." Arbitration Hr'g Tr. at 766 (April 28, 2004). In addition, there is evidence, as there was in *Merrill Lynch*, that Kurke was "not advised of [his] right to reject the unauthorized trades." 901 F.2d at 1129. Indeed, Kurke testified that Fong told him that "he absolutely could not rescind the trades." Arbitration Hr'g Tr. at 692 (April 28, 2004). He "couldn't undo buys," Fong told Kurke, "because they were already there," and "he couldn't undo sales because they were no longer in the possession of the company." *Id*. Under these circumstances, we can readily "discern [a] colorable justification for the arbitrator[s'] judgment," *GMS Group*, 326 F.3d at 78, and cannot say that their award was made in manifest disregard of the law regarding ratification.

B

Oscar Gruss' second argument is that Kurke failed to mitigate or minimize his damages. According to Oscar Gruss, once Kurke learned of Fong's unauthorized trading and churning in the fall of 1999, he should have immediately "minimize[d] his alleged damages by liquidating the allegedly unauthorized or improper purchase transactions." Appellant Oscar Gruss Br. 28. Kurke's failure to liquidate his account until its value fell to $39,000 should, the company argues, relieve it of some, if not all, financial responsibility.

Although "New York's[6] courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages," *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985), "the test applied to plaintiff's conduct is whether the action taken in response to the defendant's breach was reasonable," *Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F. Supp. 212, 219 (S.D.N.Y. 1990); *see Air Et Chaleur*, 757 F.2d at 494; Appellant Oscar Gruss Br. 26-27 (citing New York cases stating that a plaintiff's efforts at mitigation are governed by a reasonableness standard). "If the course of conduct chosen by the plaintiff was *reasonable*, the plaintiff can recover despite the existence of another reasonable course of action that would have further lessened plaintiff's damages." *Novelty Textile*, 743 F. Supp. at 219 (citing *Federal Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 350 (2d Cir. 1986)). Moreover, "the burden of showing that a plaintiff has unreasonably failed to minimize damages rests with the wrongdoer," in this case with defendant Oscar Gruss. *Id.* at 218; *see Air Et Chaleur*, 757 F.2d at 494; *see also id.* at 494-95 (upholding the district court's determination that the defendant failed to satisfy its burden because it failed to show what costs the plaintiffs would have incurred had they attempted to sell the controverted stock).

---

[6] Kurke's margin agreement stipulated that "[t]his contract shall be governed by the laws of the State of New York," J.A. 396, and the Oscar Gruss branch that handled Kurke's account was located in New York. Although the parties' briefs moot the choice of law issue, and Oscar Gruss argues that New York law should apply, no party suggests that the outcome of the case depends upon which jurisdiction's law applies.

The arbitrators did not manifestly disregard the law by rejecting Oscar Gruss' mitigation argument.[7]  When Kurke became aware of Fong's unauthorized trading, he repeatedly called Fong to complain.  Kurke testified that Fong told him he could not rescind the trades and lulled him into believing that the problem would be remedied.  Fong told Kurke that there was "'nothing [he could] do with [the shares in the account] except sell them at the right time,'" and he "assured [Kurke] they'd make money."  Arbitration Hr'g Tr. at 692 (April 28, 2004).  Fong "kept promising [Kurke] he'd fix it, to trust him, that he could . . . turn this around."  *Id*. at 766.  Under these circumstances, the arbitrators may well have concluded that it was reasonable for Kurke to believe that the churning and unauthorized trading would cease, and that the best way to mitigate his losses was to leave the account in Fong's hands so that he could "turn this around."  *Id*.

C

In reviewing the decision of an arbitration panel, we do not decide whether we would have assessed either the facts or the law in the same manner as the panel.  *See United Paperworkers Int'l Union v. Misco, Inc*., 484 U.S. 29, 38 (1987); *Kanuth*, 949 F.2d at 1178; *GMS Group*, 326 F.3d at 77-78.  Our only task is to determine whether the panel manifestly disregarded the law.

---

[7]Indeed, it is not even clear that they did reject the argument. Kurke sought $1,600,000 in compensatory damages, but the panel awarded him only $648,000.  Although the panel did not explain how it arrived at that figure, it is possible that the amount the panel awarded -- which was substantially less than the reduction in value of Kurke's account from December 31, 1999 to April 30, 2000 -- reflected the panel's judgment that Kurke had at least partially failed to mitigate.

For the foregoing reasons, we conclude that the panel did not do so in rejecting Oscar Gruss' ratification and mitigation defenses.

IV

Philip Wagenheim appeals the arbitration award against him on three grounds.  First, he adopts the Oscar Gruss arguments that we have rejected above.  Second, he argues that the arbitrators applied the wrong interest rate to the arbitration award, an argument that he did not make in the district court and that we therefore decline to hear.[8]  Finally, he maintains that the arbitrators manifestly disregarded the law by holding him vicariously liable for Fong's unauthorized trading on Kurke's account.  We address that contention here.

The premise of Wagenheim's argument is that he cannot be held liable for Fong's misdeeds under a respondeat superior theory because "there was no evidence sufficient to support a finding that [he] was an owner of the investment firm or supervisor of the broker involved."  Appellant Wagenheim Br. 1.  That factual assertion is simply incorrect.  It is certainly true that *Wagenheim* testified that he was never a branch manager or compliance officer, and that he had no ability to hire or fire Oscar Gruss employees.  *See* Arbitration Hr'g Tr. at 259-61, 429-30 (April 27, 2004).  But Wagenheim's was not the only testimony before the arbitrators.

---

[8] *See United States v. Gartmon*, 146 F.3d 1015, 1029 (D.C. Cir. 1998) ("We may dispense with [appellant's] contention without further discussion because [appellant] waived it by failing to raise it below."); *Grant v. United States Air Force*, 197 F.3d 539, 542 (D.C. Cir. 1999) ("'Absent "exceptional circumstances," the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in proceedings below.'" (quoting *Tomasello v. Rubin*, 167 F.3d 612, 618 n.6 (D.C. Cir. 1999))).

15

Kurke testified that he spoke by telephone with Wagenheim, who represented that he was Fong's superior and an owner of Oscar Gruss. *See id.* at 771 (April 28, 2004). Kurke recounted Wagenheim as saying that he "owned the company," *id.*, that "he made the hiring decisions," *id.* at 772, and that he had personally hired Fong despite knowing of a "blemish" on his record, *id.* Wagenheim also told Kurke that, if Kurke were to sue Fong, Wagenheim would "end up paying for it." *Id.* at 774. "It's going to come out of my pocket," Wagenheim said. *Id.*

Wagenheim argues that Kurke's testimony inaccurately characterized the telephone conversation between them, and that tape recordings of this and other calls -- which were played for the arbitrators -- "do not support" Kurke's testimony. Appellant Wagenheim Br. 4. According to Wagenheim, "[w]hat the tape recordings show is that Mr. Wagenheim was referring to his branching off as of May 1, 2000, to set up his own company," and not to his status at Oscar Gruss. *Id.*

Although the tape of an April 19, 2000, call does contain some discussion of a future venture, it also records Wagenheim telling Kurke: "I founded the Private Client Group of Oscar Gruss, where your account is being managed." Arbitration Hr'g Tr at 274 (April 27, 2004). The tape of a call between the two men on the previous day records Wagenheim as saying: "[Y]ou know, I run the place." *Id.* at 269. Referring to Oscar Gruss employees, including the firm's compliance officer, Wagenheim said in that call: "These are all people that I employ. These are people that I pay their paycheck -- or that Oscar Gruss pays their paychecks -- but through funds that we give them." *Id.* at 270. And in a telephone call recorded the week before, Amy Cernitz, the manager of the Oscar Gruss branch at which Kurke had his account, described Wagenheim to Kurke as follows: "[H]e's one of the Senior Managing Partners here. . . . He's Chris

[Fong]'s boss. He's fully aware of the situation with you and Chris." *Id*. at 265.

The principal case that Wagenheim cites to dispute the arbitration panel's finding of vicarious liability is *In re Irvine Sensors Corp.*, No. 02-159, 2003 U.S. Dist. LEXIS 18397 (C.D. Cal. Sept. 22, 2003). There, the court held that, in order to establish vicarious liability, a plaintiff must demonstrate: "(1) a primary violation of securities law, and (2) the individual exercised actual power or control over the primary violator." *Id.* at *8. Wagenheim does not dispute that the first criterion is satisfied here. And Kurke's testimony was certainly sufficient to satisfy the second. In these circumstances, we cannot conclude that the arbitrators' finding of vicarious liability was made in manifest disregard of the law.

V

The "manifest disregard of the law" standard for overturning an arbitration award is manifestly difficult to satisfy. At best, the appellants have suggested that the arbitrators relied upon debatable points of law or disputable issues of fact. Neither is sufficient to establish manifest disregard. *See Kanuth*, 949 F.2d at 1178. Accordingly, the judgment of the district court is

*Affirmed*.