Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 22, 2007         Decided March 16, 2007

No. 06-7067

MICHAEL LESSIN,
APPELLANT

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. AND
BRETT BERNSTEIN,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv00171)

———

*Robert A. Kantas* argued the cause and filed the briefs for appellant.

*Mary Gail Gearns* argued the cause and filed the brief for appellees.  *Edward L. Powers* and *Lauren C. Gould* entered appearances.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: During a ten-month period in 2000, Michael Lessin lost $5.6 million in his brokerage account with Merrill Lynch, Pierce, Fenner & Smith, Inc. He appeals the district court's denial of his motion to vacate an arbitration award in his favor for $32,975. Lessin contends vacation is required because the arbitrators refused to hear one of his expert witnesses and demonstrated a manifest disregard of the law in awarding compensatory damages. In the absence of any prejudice as a result of the evidentiary ruling and in light of the record support for the award, we affirm.

**I.**

Lessin opened a brokerage account with Merrill Lynch in mid-January 2000. When he opened the account, Lessin held almost $5.3 million in Yahoo! securities and a $2.1 million margin balance. Previous to this, Lessin had worked at Broadcast.com and exercised options of $99,000 in Broadcast.com stock. A few months later, Yahoo! acquired Broadcast.com. Lessin then opened a brokerage account at Ferris, Baker Watts, Inc., executing a New Account Form specifying that his priority investment strategies were speculation and aggressive growth. His broker at Ferris was Robert Jones. As a result of the acquisition, Lessin was able to exchange his Broadcast.com stock for shares in Yahoo! worth approximately $2.3 million. By January 2000, after just seven months, Lessin's account had increased in value to approximately $4.9 million.

In January 2000, Lessin transferred his account to Merrill

Lynch, which charged a flat rate per year instead of a commission on each trade. At Merrill Lynch he executed a Retail Account Profile stating that his investment objective was "growth" and that his risk tolerance was "aggressive." In his Option Agreement he specified that his objective was "speculation" and that he had five years experience trading equities and options. He also signed a transfer form on which he wrote: "DO <u>NOT</u> LIQUIDATE ANYTHING." His broker at Merrill Lynch was Brett S. Bernstein. By October 2000, Lessin's account had lost almost 100% of its value.

In February 2003, pursuant to a standard brokerage contract to arbitrate disputes before a panel of the National Association of Securities Dealers ("NASD"), Lessin filed a statement of claim against Merrill Lynch and Bernstein for between $5 and $10 million in compensatory damages as well as for punitive damages. A panel of three NASD arbitrators heard evidence over a six-day period. The panel found Merrill Lynch, but not Bernstein, liable to Lessin for compensatory damages of $32,975. Lessin filed a motion to vacate the award in the Superior Court of the District of Columbia, which Merrill Lynch removed to the federal district court. The district court denied the motion to vacate, and Lessin appeals. This court reviews a district court's confirmation of an arbitration award for clear error as to findings of fact and *de novo* as to questions of law. *Kurke v. Oscar Gruss & Son*, 454 F.3d 350, 355 (D.C. Cir. 2006).

## II.

Judicial review of arbitration awards is limited. In addition to the grounds under the Federal Arbitration Act ("FAA") on which an arbitration award may be vacated, an award may be vacated only if it is in "manifest disregard of the law" or is contrary to an "explicit public policy." *LaPrade v. Kidder,*

*Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001) (internal quotation marks omitted); *cf. Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486-88 (D.C. Cir. 1997). Lessin's appeal invokes both the statutory and non-statutory grounds for vacation.

Under the FAA, an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in *refusing to hear evidence pertinent and material to the controversy*; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a) (emphasis added).

Lessin contends that the arbitration panel engaged in misconduct by refusing to hear pertinent and material evidence from one of his designated expert witnesses. In considering this contention, the court is mindful of the fact that "[i]n making evidentiary determinations, an arbitrator 'need not follow all the niceties observed by the federal courts.'" *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (quoting *Bell Aerospace Co. Div. of Textron v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974)). The arbitrator "need only grant the parties a fundamentally fair hearing." *Bell Aerospace*, 500 F.2d at 923; *accord Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th

Cir. 2001); *see Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985); *Nat'l Post Office Mailhandlers v. U.S. Postal Serv.*, 751 F.2d 834, 841 (6th Cir. 1985); *Totem Marine Tug & Barge v. N. Am. Towing*, 607 F.2d 649, 651 (5th Cir. 1979); *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3rd Cir. 1968). It is well within an arbitrator's authority to refuse to hear evidence that is cumulative, *see, e.g.*, *Hoteles Condado Beach*, 763 F.2d at 40; *Nat'l Post Office Mailhandlers*, 751 F.2d at 841, or of little relevance, *see, e.g*, *Hoteles Condado Beach*, 763 F.2d at 40; *Grahams Serv. Inc. v. Teamsters Local 975*, 700 F.2d 420, 422-23 (8th Cir. 1982); *see also* SEC. INDUS. CONFERENCE ON ARBITRATION, THE ARBITRATOR'S MANUAL 26 (May 2005).

At the arbitration proceedings, Lessin testified that Bernstein had misrepresented his experience as a broker and had never cautioned him regarding the excessive risk in his accounts. Lessin also elicited testimony that Merrill Lynch had failed to supervise Bernstein, and he presented evidence that both Bernstein and Merrill Lynch had encouraged the use of excessive margin loans, and that Merrill Lynch had maintained a "buy" recommendation on Yahoo! during the period when Lessin lost $3.7 million on the stock. According to Lessin, this loss was compounded by a $1.1 million loss on Be Inc. ("BEOS"), a stock that Bernstein had continuously recommended. While acknowledging that he had received monthly statements on the status of his account and written confirmations of each security trade, and that he had tracked his stocks on Merrill Lynch's website, Lessin claimed that he did not study these materials and only did what Bernstein recommended.

Both Bernstein and Robert Jones, Lessin's broker at Ferris, testified that they had advised Lessin to diversify his account.

Jones testified that Lessin had said from the beginning that he wanted to trade on margin and did not want to sell the Yahoo! stock. Jones had advised Lessin that he had too much Yahoo! stock, but Lessin "loved Yahoo! [and] he thought it was going higher [in value]." Bernstein testified to the same effect and that he had advised Lessin to pay off some of his margin debt, but that Lessin had repeatedly "made it very clear . . . he did not want to sell Yahoo!; it wasn't an option." Bernstein also testified that he had made notations of his advice to Lessin on his computer in a program called Gold Mine. Those notations included an entry dated October 11, 2000 that:

> Howard [Rothman, another Merrill Lynch broker] and I had spoken to [Lessin] numerous times about being so aggressive, especially on margin. Also, we were discussing that he wouldn't take losses on the [stocks] that were on margin [because] he felt they would come back. Now, [after a large margin call,] he was forced to sell them. He thought he knew it all.

Lessin proffered two expert witnesses in an attempt to show that the Gold Mine notes were fabricated after the fact. The first was Kenneth Bradley, an independent computer forensic examiner trained at the Defense Department in techniques of evidence recovery. He opined, based on his examination of the hard drive on Bernstein's computer, that many of the Gold Mine entries appeared to have been made at the same time. Merrill Lynch's expert, Michael William Finnie, who also had examined the hard drive, testified that a maintenance function, which indexes a database by sorting entries into files, had been run on the hard drive and explained the compression of the Gold Mine data. While both experts ultimately agreed that certain Gold Mine entries were genuine, they disagreed regarding the genuineness of the October 11, 2000 note.

After hearing a full day of testimony from each party's expert, the panel announced the following morning that it had decided it did not need to hear from Lessin's second expert, Art Ehuan, a certified forensics computer examiner with experience in the private and public sectors, who taught at Georgetown and George Washington Universities. The panel chairman explained that the panel members thought they had sufficient information about what had happened and how the Gold Mine program worked. They also did not want to face the possibility of hearing from a rebuttal expert witness called by Merrill Lynch if Lessin were allowed to call a second expert.

Lessin objected, stating that he had given notice of the witness and that the second expert was important to his case in chief because his first expert had not commented on the validity of the Finnie report, which his second expert was designated to do. Regarding the possibility of a rebuttal expert, he pointed out that Merrill Lynch had already had two bites at the apple because it had submitted a supplemental affidavit and Bradley had given Finnie his notes on his examination of Bernstein's computer. Merrill Lynch responded that Lessin had proposed to call the second expert to address its claim that Bradley had performed his analysis in an unsound fashion, and since the second expert had not personally examined the hard drive he would simply be offering an opinion regarding the reports of the two experts who had personally examined it, which was not relevant. The panel chairman stated that Lessin's objection was noted and the panel proceeded to hear other testimony.

As the First Circuit has explained, "[e]very failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur of an arbitrator's award." *Hoteles Condado Beach*, 763 F.2d at 40; *see Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 280 (7th Cir. 1992). Rather, a federal court may vacate an award only if the panel's "refusal to hear

pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Hoteles Condado Beach*, 763 F.2d at 40; *see Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1490 (9th Cir. 1991) (citing, e.g., *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 350 (1854)).  Thus, there is  no statutory ground for vacation of the arbitration award if the arbitrators refused to hear from Lessin's second expert because the evidence would be irrelevant or merely cumulative.  *See Hoteles Condado Beach,* 763 F.2d at 40; *Nat'l Post Office Mailhandlers*, 751 F.2d at 841; *Grahams Serv. Inc.*, 700 F.2d at 422-23; *see also* NASD Manual, Code of Arbitration Procedure Rule 10323.  There is, however, support for Lessin's position that his second expert's testimony would not have been cumulative because, unlike his first expert, his second expert was retained to comment on the methodology used by the other experts.  Lessin points out that his first expert did not opine on the issue of methodology or address the significance of omissions in the Finnie report and that he had anticipated addressing those issues through Ehuan's expert testimony.

Expert testimony on methodology may be substantively different from expert testimony expressing an opinion based on personal observation and testing.  Generally speaking, the former might be described as concerning the application of a specialized theory in a particular case while the latter concerns specialized observations and the specialized translation of those observations into theory.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999); *see also* FED. R. EVID. 703.  In the instant case, expert testimony regarding the methodology employed to determine the genuineness of Bernstein's Gold Mine notes would have been pertinent and material because the two experts from whom the panel did hear reached opposite conclusions about the validity of the October 11 note.  Cross-examination had revealed omissions in the procedures used by

each of the experts. Expert testimony on whether such omissions raised doubts about either expert's conclusion could have assisted the panel in resolving whether Bernstein's Gold Mine notes were fabricated, and, thus, in determining Bernstein's credibility in testifying about the investment advice he had given Lessin. As Lessin suggests, Bernstein's testimony was a key part of Merrill Lynch's defense.

The ultimate question, however, is whether the panel's refusal to hear testimony from Lessin's second expert deprived Lessin of a fair hearing. *See Hoteles Coronado Beach*, 763 F.2d at 40. On this record we find no evidence that it did.

First, Lessin's expert Bradley acknowledged on cross-examination that there were two genuine archived copies of Bernstein's Gold Mine entries: one file was last modified on September 21, 2000 and the other file was last modified on October 3, 2000. These copies included entries dated October 2 and 3, 2000 that contained similar information to the October 11 note. The October 2 note stated that Bernstein told Lessin "several times to diversity his YHOO and not margin his acct. so high . . . [but Lessin] didn't see the value and hedge of writing covered calls." The October 3 note stated that Bernstein "went over w/ [Lessin] more details on margin and where YHOO has to drop for his acct. to be zero. [Lessin] is still looking at depositing money from his business into his personal acct. to cover his margin call. I recommended against it." Even if other Gold Mine entries were backdated, these genuine entries provided contemporaneous support for Bernstein's testimony about his advice to Lessin. Merrill Lynch also points to Bernstein's email of November 15, 2000, but this correspondence was prompted by a request from Bernstein's supervisor to explain the huge losses in Lessin's account; it not only came too late to have afforded any benefit to Lessin but it was made at a time when it was in Bernstein's self interest to

paint a very favorable picture of his relations with Lessin.

Second, the testimony of Robert Jones, Lessin's broker at Ferris, corroborated Bernstein's description of Lessin's investment conduct at Merrill Lynch and Lessin's intention to make his own investment decisions irrespective of his broker's advice. Third, the documentary evidence – Lessin's New Account Form at Ferris and his Retail Account Profile, Option Agreement, and transfer form at Merrill Lynch – also corroborated the testimony of his brokers to the extent that Lessin's rejection of the advice to diversify, to sell Yahoo!, and to pay down his margin was consistent with his stated investment objectives.

Together this evidence rendered immaterial whether Bernstein had fabricated the October 11 note and, thus, also rendered immaterial the testimony of Lessin's second expert. Lessin did not present evidence that challenged the genuineness of the October 2 and 3 notes in the Gold Mine program on Bernstein's computer. He could hardly dispute his stated preference for aggressive investment and the "DO NOT LIQUIDATE" instruction in the brokerage documents that he had executed. Even if Lessin's second expert had persuaded the panel that the methodology used by Merrill Lynch's expert was flawed, that testimony would have left unchallenged the other computer notes supporting Bernstein's version of events. Lessin had opportunities to challenge Bernstein's credibility, and did so during cross-examination and by presenting emails he had received from Bernstein that did not include the disputed advice, but the corroborating evidence was nonetheless substantial. Hence, it is unsurprising that Lessin's objection to the panel's ruling not to allow him to present his second expert's evidence failed to identify the prejudicial effect to his case in chief.

Lessin thus fails to show that the panel's refusal to hear

evidence deprived him of a fair hearing. By the time it decided not to hear from his second expert, the panel was in a position to conclude that methodology was no longer material to the question of Bernstein's credibility. As the district court concluded, the panel found that Lessin was responsible for his own losses because his conduct in holding his Yahoo! stock without diversifying and in trading on margin, notwithstanding his continuous awareness of the status of his accounts, reflected his stated investment objectives.

Lessin's other contention – that vacation is required because the panel failed to adjudicate his claims against Bernstein, rendering the award indefinite and incomplete under the FAA, 9 U.S.C. § 10(a)(4) – is frivolous: the October 8, 2006 award stated that "[a]ny relief not specifically addressed herein, including punitive damages, is denied in its entirety."

## III.

Lessin challenges the amount of the award on two grounds: He claims that the panel exceeded or imperfectly executed its powers by awarding him one-half of one percent of his documented damages and that it disregarded the law on negligent supervision by implicitly finding that Merrill Lynch failed properly to supervise its broker and then awarding only a fraction of the proven damages. Neither claim has merit.

## A.

In the district court, Lessin argued that the panel had failed to explain how it had arrived at $32,975 as the amount of compensatory damages. The district court found, based on inferences from the arbitration record, that the panel credited the testimony of Lessin's brokers but did not credit his testimony and concluded, based on his preferred investment strategy as set forth in the brokerage documents he executed, that Lessin, not

Bernstein, was responsible for his losses. Further, citing *Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 532 (D.C. Cir. 1989), which held that arbitrators are not required to explain the basis for their award when the grounds can be gleaned from the record, the district court found no evidence the arbitrators disregarded the law. The district court concluded that the amount represented the $500 non-refundable filing fee that Lessin paid upon submitting his claim to arbitration and $32,475 for management fees he paid to Merrill Lynch, noting that the panel had found that Merrill Lynch had failed to supervise Bernstein properly.

Lessin's claims of error on appeal are premised on the flawed notion that his out-of-pocket losses at Merrill Lynch are proof of the measure of his compensable damages. We find no error in either the district court's reasoning or its findings rejecting that notion. As the district court succinctly put it, the record supports the inference that the panel concluded that "Lessin risked losses to his account, and his account suffered losses as a result." Lessin's protests that the award was arbitrary and capricious, *see Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 435 (11th Cir. 1995), and that the award was irrational, *see Brabham v. A.G. Edwards & Sons*, 376 F.3d 377, 382 n.6 (5th Cir. 2004) (citing cases), fare no better. Even assuming such standards were consistent with this circuit's scope of review, he fails to show, given the panel's determination that only Merrill Lynch was liable, that the award was arbitrary and capricious or irrational.

**B.**

In *LaPrade*, the court explained that:

> [m]anifest disregard of the law means more than error or misunderstanding with respect to the law. Consequently, to modify or vacate an award on this

> ground, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

246 F.3d at 706 (citations and quotation marks omitted). Lessin's contention that the panel acted in manifest disregard of law is based primarily on the admissions of Bernstein's supervisor, who testified that a Merrill Lynch supervisor should have contacted Lessin to be sure he understood the risks before his account had decreased so greatly in value. His suggestion that a failure to supervise claim can only exist where the person being supervised has done something wrong ignores that there was an independent basis for the panel to find Merrill Lynch liable. Hence, his reliance on *Spear, Leeds & Kellogg v. Bullseye Securities, Inc*., 738 N.Y.S.2d 27, 28-29 (App. Div. 2002), is misplaced. In that case there was no evidence, independent of employee negligence, that the firm had failed to perform contracted services. Here there was evidence that Merrill Lynch failed to provide the supervision that it had contracted to provide.

To the extent Lessin also contends that equity demands Merrill Lynch not be allowed to retain profits it made from his account, he fails to show, in light of his contractual obligation to submit any disputes with Merrill Lynch and Bernstein to arbitration, that the panel acted beyond its authority. Our limited scope of judicial review does not extend to reweighing equities supported by the arbitration record. *See Kurke*, 454 F.3d at 357-58. Given the evidence before the panel, Lessin fails to demonstrate that the award violated an explicit public policy.

Accordingly, we affirm the denial of the motion to vacate

the arbitration award.